IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **ORLANDO BAEZ** | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| **PRISON HEALTH SERVICES, INC., et al.** | : | No. 06-4923 |

**Norma L. Shapiro, J.**                                                                                  **July 22, 2013**

<u>MEMORANDUM</u>

Plaintiff, a capital inmate in the custody of the Pennsylvania Department of Corrections, brought suit under § 1983 alleging violations of the First and Eighth Amendments. Plaintiff alleged that defendants violated his Eight Amendment rights through their deliberate indifference to plaintiff's serious medical needs. When plaintiff complained about the inadequate medical treatment, defendants allegedly violated plaintiff's First Amendment rights by retaliating in transferring him to a different prison. A jury found that Prison Health Services, Inc. ("PHS")[1] had violated plaintiff's Eighth Amendment rights and awarded nominal damages. The jury also found that defendants Murray and Vaughn had violated plaintiff's First Amendment rights by retaliating when plaintiff complained about his medical treatment. The jury also awarded nominal damages on the First Amendment claim. Before the court is plaintiff's motion for a new trial on damages and defendant Prison Health Services, Inc.'s motion for judgment as a matter of law. Both of these motions will be denied.

**I. Factual Background**

Plaintiff was incarcerated at SCI Graterford from 1993 until April 2005. N.T. 3/1/2011, 6. He has been held at SCI Greene since April 2005. *Id.* In 2003 or 2004, Baez began to

---

[1] PHS is now known as Corizon Health, Inc. To maintain consistency with other court documents and the docket, the court will refer to the party as PHS.

1

experience health problems including chronic rashes, bumps, sores, and lesions all over his body. *Id.* The sores itched and the bumps burned as they formed. *Id.* at 6-7. Baez signed up for sick call and was first seen by Dr. Koseriowski. *Id.* at 8-9. Dr. Koseriowski simply told Baez to shower less and use less soap, and walked away. *Id.* at 9. When Baez again signed up for sick call, Dr. Arias looked at Baez's arm and part of his chest, but did not do a full examination. *Id.* at 10. Dr. Arias also told Baez to take fewer showers and use less soap. *Id.* Dr. Arias ordered a cream for plaintiff that did not help the rash. *Id.* Baez signed up for sick call on many more occasions to get the doctors to attend to his rash. The doctors never reached inside Baez's cell to touch the rash and never examined Baez. *Id.* at 11. Baez testified that the doctors' visits lasted "between five to ten seconds." *Id.*

Baez filed multiple grievances asking to be taken to a medical specialist. *Id.* at 13-15. Baez received a response from Julie Knauer, the Correctional Healthcare Administrator, that Dr. Arias did not "feel a dermatology consult was medically indicated." *Id.* at 16-18. Baez sent SCI Graterford Superintendent DiGuglielmo several complaint request slips begging him to come see Baez. *Id.* at 19. When DiGuglielmo came to see Baez, Baez completely disrobed to show DiGuglielmo the rash covered Baez's body. *Id.* at 19. DiGuglielmo spoke with Dr. Arias and promised Baez a specialty consult. *Id.* at 21. Baez did not see the specialist for another month or two. *Id.* The specialist examined Baez's upper torso, but did not take a scraping of the rash or perform any other tests. *Id.* at 22. The specialist prescribed a cream and a pill that gave some relief but did not get rid of the problem completely. *Id.*

In December 2004, Baez began to have other health problems including chest, heart, and stomach pains. *Id.* Baez submitted a sick call request and saw Dr. Koseriowski on January 7, 2005. *Id.* at 22-23. Dr. Koseriowski ordered Baez over-the-counter medicine and said he was

going to order an EKG.  *Id.* at 23-24.  The EKG was not performed until days later when Baez complained again about his condition.  *Id.* at 24.  Baez next saw P.A. Eakin who told Baez that the EKG was normal and there was nothing wrong with Baez.  *Id.* at 26.  Neither Dr. Koseriowski nor P.A. Eakin performed a physical examination.  *Id.*  Baez then saw Dr. Arias, who ordered drugs to treat a gas problem.  On January 31, 2005, Baez filed another grievance complaining that Dr. Koseriowski had not taken his complaints seriously and had laughed in his face.  *Id.* at 28.  The grievance was denied as frivolous.  *Id.* at 31.  On February 14, 2005, Baez was examined by Dr. Stefanic and given a steroid injection.  *Id.* at 32.  Baez's pain continued.  Baez saw Dr. Stefanic and another doctor several more times but they never reached a diagnosis or found a cure.  *Id.* at 33.

At no time did any of the doctors at SCI Graterford take a family history.  *Id.* at 33.  None of the doctors gave Baez a diagnosis.  *Id.*  The doctors did not take Baez's vital signs.  *Id.*  Since Baez's health problems began, he submitted numerous sick call requests and about twenty requests to meet with Superintendent DiGuglielmo.  *Id.* at 39, 43.

In April 2005, Baez submitted another request to meet with Superintendent DiGuglielmo.  On April 28, 2005, Baez was told DiGuglielmo would be meeting with him to discuss his medical condition.  *Id.* at 49.  Instead of that meeting, Baez was transferred to SCI Greene.  *Id.* at 50-51.  In 2006, Baez was given a tentative diagnosis of lupus rheumatosis and told that he was scheduled to see a rheumatologist.  *Id.* at 63.

At trial, Baez's expert, Dr. Kolasinski, testified that Baez has systemic Lupus Erythematosus.  N.T. 3/8/2011, 44.  Defendants' expert, Dr. Cohen, had a different diagnosis: "I think he has an autoimmune disorder with features of lupus.  I don't think it's definite lupus.  It

falls somewhere in the continuum between lupus and Sjogren's syndrome." N.T. 3/9/2011, 61. Dr. Kolasinksi testified:

> The review of the records shows that the patient sought medical care on many occasions and that, at no time, was there a unifying diagnosis that was made to explain the various laboratory abnormalities, physical complaints, and concerns of the patient.  There was a failure to take an adequate history.  There was minimal documentation of physical examination.  There was an absence of formulation of a differential diagnosis.  The treatment plans were minimal and often ineffective. There was a failure to communicate with the patient about what was occurring and there was a very limited follow up. . . .  [T]he manner in which the medical record is documented suggests that the care providers were avoiding making a diagnosis, avoiding taking the patient's concerns seriously and therefore, avoiding treating him or actually offering him medical care.

N.T. 3/8/2011, 12-13.  Dr. Kolasinski testified that these deficiencies applied to all of Baez's care providers.  *Id.* at 19-20, 25, 30-31.  She testified that based on her review of the medical records, a complete physical examination was never performed at SCI Graterford.  *Id.* at 22.  Dr. Kolasinski testified that when laboratory tests were performed on Baez they produced abnormal results, but no care provider ever followed up on those results.  *Id.* at 33-34.  She testified that if Baez had been provided with adequate medical care, his condition could have been diagnosed and treated.  *Id.* at 51-52.  She testified that the majority of patients appropriately treated for lupus see improvement in their symptoms.  *Id.* at 52.  Furthermore, the failure to treat Baez in a timely manner resulted in more generalized pain that would be more difficult to treat in the future.  *Id.* at 53.

Dr. Cohen opined that Baez's treatment at SCI Graterford "was appropriate." N.T. 3/9/2011, 60. Dr. Cohen testified that the notes kept by the doctors were "slightly below average for notes for general practitioners," and that the quality of the notes varied considerably with some being detailed and clear and others being very short. *Id.* at 77. Dr. Cohen thought that the delay in Baez seeing a dermatologist was not unusual. *Id.* at 65. Dr. Cohen testified that even if Baez had been diagnosed with lupus earlier, there was no treatment at the time that would have made any significant difference in the outcome. *Id.* at 77. He testified that Baez had no end organ damage. *Id.* at 69-70. Baez was given a course of Prednisone while at SCI Graterford, a drug that would have been given to Baez even if a correct diagnosis had been made at the time, and that did not help Baez's symptoms. *Id.* at 68-70. Furthermore, none of the treatments given to Baez up to the time of trial gave him significant relief, even after Baez had been diagnosed and was receiving treatment at different institutions including the University of Pittsburgh. *Id.* at 69. Based on this evidence, Dr. Cohen testified that Baez's treatment at SCI Graterford did not cause Baez harm. However, Dr. Cohen acknowledged that there was no record of the treating doctors ever asking Baez about family history, that a physical examination would have been appropriate in treating Baez's symptoms, and that the treating doctors never developed a differential diagnosis for Baez's symptoms. *Id.* at 94-98.

## II.  Procedural Background

Plaintiff filed a second amended complaint against Prison Health Services, Inc.; Jeffrey Beard, Secretary of the Pennsylvania Department of Corrections; David DiGuglielmo, Superintendent of SCI Graterford; Julie Knauer; Dr. Arias; Dr. Koseriowski; Dr. Stefanic; P.A. Eakin; Sharon Burks; Wendy Moyer; Donald Vaughn; and John Murray. Plaintiff alleged violations of his First and Eighth Amendment rights. Plaintiff alleged that defendants violated

5

his First Amendment rights in retaliating against him for submitting grievances by transferring him to SCI Greene.  Plaintiff alleged that defendants violated his Eighth Amendment rights in being deliberately indifferent to his serious medical needs.  After the court granted partial summary judgment for defendants, First Amendment claims remained against DiGuglielmo, Vaughn, and Murray.  Eighth Amendment claims remained against DiGuglielmo, Knauer, Burks, Moyer, PHS, Arias, Eakin, Koseriowski, and Stefanic.  Doc. 189.

After all parties had presented evidence at trial but prior to closing arguments, defendants moved for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(a).  The court granted the motions in part.  Doc. 217; Doc. 232.  The First Amendment claim was submitted to the jury as to defendants Murray and Vaughn.  The Eighth Amendment claim was submitted to the jury as to defendants PHS, Arias, Koseriowski, Stefanic, and Knauer.

In response to interrogatories, the jury found that Baez had proven that he presented a serious medical need.  Doc. 214, 1.  The jury found that PHS was deliberately indifferent to Baez's serious medical need, but that Drs. Arias, Koseriowski, and Stefanic were not.  Doc. 214, 2.  The jury found that Baez had proven that PHS's deliberate indifference caused him harm, but awarded Baez only nominal damages of $1.  Doc. 214, 2-3.  The jury also found that Ms. Knauer did not have actual or constructive knowledge that Baez was being mistreated or was not being treated for his serious medical need.  Doc. 214, 4.  On the First Amendment claim, the jury found that Murray and Vaughn were both involved in the decision to transfer Baez to SCI Greene and that both defendants would not have transferred Baez but for his filing grievances.  Doc. 214, 6-7.  The jury awarded Baez only nominal damages of $1 against each of the two First Amendment defendants.  Doc. 214, 7-8.  The court entered judgment in favor of Baez against defendants

PHS, Murray, and Vaughn in the amount of $1 each, and in favor of defendants Arias, Koseriowski, Stefanic, and Knauer against Baez. Doc. 223.

Plaintiff, arguing that the verdict is against the weight of the evidence, has now moved for a new trial on damages pursuant to Federal Rule of Civil Procedure 59(a)(1)(A). Plaintiff also argues that the court should order a new trial on damages because of errors in the jury instructions. Defendant PHS renewed its motion for judgment as a matter of law under Rule 50(b).

### III. Legal Standard

Federal Rule of Civil Procedure 59(a)(1)(A) allows the court to "grant a new trial on all or some of the issues—and to any party— . . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court." "The scope of the court's discretion in evaluating a motion for a new trial depends upon whether the motion is based upon a prejudicial error of law or a verdict alleged to be against the weight of the evidence." *Dean v. Specialized Sec. Response*, 876 F. Supp. 2d 549, 553 (W.D. Pa. 2012).

"[N]ew trials because the verdict is against the weight of the evidence are proper only when the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record, cries out to be overturned or shocks our conscience." *Williamson v. Consol. Rail Corp.*, 926 F.2d 1344, 1353 (3d Cir. 1991).

> "When the district court grants a motion for a new trial based on the weight of the evidence, the court has to some extent at least, substituted its judgment of the facts and the credibility of the witnesses for that of the jury. Such an action effects a denigration of the jury system and to the extent that new trials are granted

the judge takes over, if he does not usurp, the prime function of the jury as the

trier of facts."

*Id.* at 1352 (internal quotations omitted). "Where the subject matter of the litigation is simple and within a layman's understanding, the district court is given less freedom to scrutinize the jury's verdict than in a case that deals with complex factual determinations . . . ." *Id.*

With regard to plaintiff's contentions regarding the jury instructions, Rule 51(d) provides that "[a] party may assign as error an error in an instruction actually given, if that party properly objected." "A court may consider a plain error in the instructions that has not been preserved as required by Rule 51(d)(1) if the error affects substantial rights." Fed. R. Civ. P. 51(d)(2). "[A] district court also must utilize plain error review when deciding whether to grant a reversal or new trial based on objections untimely raised." *ID Sec. Sys. Canada, Inc. v. Checkpoint Sys., Inc.*, 249 F. Supp. 2d 622, 669 (E.D. Pa. 2003).

After a jury trial, a court may grant a motion for judgment as a matter of law if no reasonable jury could have had a legally sufficient evidentiary basis for finding for a particular party on a particular issue. Fed. R. Civ. P. 50(a). In evaluating a motion under Rule 50, a court "must view the evidence in the light most favorable to the non-moving party, and determine whether the record contains the minimum quantum of evidence from which a jury might reasonably afford relief." *Glenn Distributors Corp. v. Carlisle Plastics, Inc.*, 297 F.3d 294, 299 (3d Cir. 2002) (internal quotations omitted). A court should grant the motion "only if, viewing the evidence in the light most favorable to the nonmovant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find liability. *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1166 (3d Cir. 1993).

> In determining whether the evidence is sufficient to sustain liability, the court may not weigh the evidence, determine the credibility of witnesses, or substitute its version of the facts for the jury's version. Although judgment as a matter of law should be granted sparingly, a scintilla of evidence is not enough to sustain a verdict of liability. The question is not whether there is literally no evidence supporting the party against whom the motion is directed but whether there is evidence upon which the jury could properly find a verdict for that party.

*Id.* (3d Cir. 1993) (internal quotations and citations omitted).

**IV. Discussion**

A. *Plaintiff's Motion for a New Trial on Damages*

Plaintiff argues that he is entitled to a new trial on damages because the jury's award of nominal damages against PHS was against the great weight of the evidence. Baez contends that because he unquestionably suffered actual harm, the jury should not have been afforded the option of awarding nominal damages. According to plaintiff, Baez's testimony demonstrated that he suffered from pain and was supported by the multiple grievances and request slips Baez filed seeking treatment. Plaintiff argues that Dr. Kolasinski verified that Baez must have suffered great pain.

PHS responds that Baez failed to show any injury he may have suffered was caused by a policy, practice, or custom of PHS. Dr. Cohen testified the care provided to Baez was adequate and that he was treated properly with nonsteroidal anti-inflammatory medications. Dr. Cohen also testified that even if Baez had been diagnosed with lupus earlier, nothing could have been done to change his medical condition.

The jury's award of only nominal damages does not shock the conscience, nor did it clearly result in a miscarriage of justice. Although it was clear that Baez did have lupus or some other disorder, the jury could have found Baez's testimony regarding the extent of his pain incredible. Furthermore, the jury had to identify the damages that were caused by defendant's deliberate indifference, not the harm caused by Baez's disorder. The jury may have reasonably believed Dr. Cohen that "there [was] no intervention at the time [Baez] was seen at Graterford that would have made any difference." N.T. 3/9/2011, 77. Dr. Cohen testified that because Baez had no end organ damage, there was no lasting damage caused by defendant's failure to diagnose Baez's condition promptly. *Id.* at 69-70, 78. Dr. Cohen testified that Baez was given some of the same treatment he would have received even if he had been diagnosed earlier, and that none of the drugs given to Baez since he left SCI Graterford have given him any significant relief. *Id.* at 69-70.

The jury could reasonably have believed Dr. Kolasinski that Baez's treating physicians gave Baez deficient care. The jury could also reasonably have believed Dr. Cohen that proper diagnosis and treatment would not have improved Baez's condition. Even plaintiff's expert, Dr. Kolasinski, could not state that proper documentation, diagnosis, and treatment would necessarily have ameliorated Baez's pain. When pressed, Dr. Kolasinski would only state that reasonable care "*could* have" improved Baez's condition. *Id.* at 38-41. Both of the expert physicians were qualified experts and credible witnesses. The court will not supplant the jury's determination of the facts with its own where the jury reasonably determined that Baez did not prove he was entitled to compensatory damages.

To the extent that plaintiff's motion rests on his argument that the court erred in instructing the jury that it could find nominal damages, plaintiff has waived that objection.

10

Plaintiff did not object at trial to the court giving the jury the option of awarding nominal damages. Plaintiff's proposed jury instructions contained an instruction on nominal damages. Doc. 199, 20. Because Dr. Cohen credibly testified that Baez suffered no harm due to defendant's medical care, it was not plain error for the court to instruct the jury on the possibility of nominal damages. Under any standard of review, Dr. Cohen's testimony required that the question of whether plaintiff suffered compensatory damages go to the jury.

Plaintiff also contends that in explaining compensatory damages the court left the jury with the incorrect belief that compensatory damages are only appropriate for out-of-pocket expenses. In explaining that "compensatory damages are actual damages," the court gave the example of a plaintiff who incurred out-of-pocket expenses by having to hire a physician to treat him. N.T. 3/14/2011, 109. The court clarified that this did not happen in Baez's case and went on to describe other types of compensatory damages, including for physical, emotional, or mental harm. Plaintiff argues that the court's instruction on out-of-pocket damages was not incorrect but unnecessary under the facts. Plaintiff argues that these unnecessary instructions may have confused the jury and led the jury to believe that finding out-of-pocket damages was a prerequisite to finding other compensatory damages.

A "district court has substantial discretion with respect to specific wording of jury instructions and need not give a proposed instruction if essential points are covered by those that are given. *Grazier ex rel. White v. City of Philadelphia*, 328 F.3d 120, 127 (3d Cir. 2003) (internal quotations omitted). The district court abuses its discretion only "if the instruction was capable of confusing and thereby misleading the jury." *Id.* at 126. While the court's example of out-of-pocket expenses would not have been necessary, examined in the context of the instruction as a whole, it was not erroneous or confusing. The court never implied that out-of-

pocket damages were a prerequisite to finding other compensatory damages. The court clearly instructed that "the injury to Mr. Baez can be physical, emotional, or mental. In other words, we call pain and suffering part of compensatory damages." N.T. 3/14/2011, 110. In the court's instruction on nominal damages, the court again referenced the possible compensatory damages the jury could find: "Now if you find for Mr. Baez, but you find he's failed to prove actual damages such as physical, emotional, or mental harm, you can return an award of what we call nominal damages . . . ." *Id.* at 111. There could be no confusion from these instructions that out-of-pocket damages were not a prerequisite to any other type of compensatory damages. Furthermore, plaintiff failed to make this objection at trial; there was no plain error in the jury instructions.

      Plaintiff's motion for a new trial on damages will be denied.

B. *Defendant's Motion for Judgment as a Matter of Law*

      Defendant argues that Baez failed to identify a policy practice, or custom of PHS that PHS should have implemented and that PHS knew was needed to avoid a substantial risk of harm to Baez. Defendant argues that it is a matter of law for the court to determine whether an employee has final policymaking authority that can serve as a basis for liability; here the court did not establish which employees had final policymaking authority. With regard to a custom that violated Baez's Eighth Amendment rights, defendant argues that Baez has failed to meet the burden of demonstrating a custom. Defendant argues that Baez did not offer evidence proving the policies he alleged led to the constitutional violation.

      In order to show a violation of Baez's constitutional right to adequate medical care, plaintiff must show, "(i) a serious medical need, and (ii) acts or omissions by prison officials that

indicate deliberate indifference to that need." *Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 582 (3d Cir. 2003). The Court of Appeals has stated:

> In order for PHS to be liable, [plaintiffs] must provide evidence that there was a relevant PHS policy or custom, and that the policy caused the constitutional violation they allege.
>
> Not all state action rises to the level of a custom or policy. A policy is made when a decisionmaker possessing final authority to establish municipal policy with respect to the action issues a final proclamation, policy or edict. A custom is an act that has not been formally approved by an appropriate decisionmaker, but that is so widespread as to have the force of law.
>
> There are three situations where acts of a government employee may be deemed to be the result of a policy or custom of the governmental entity for whom the employee works, thereby rendering the entity liable under § 1983. The first is where the appropriate officer or entity promulgates a generally applicable statement of policy and the subsequent act complained of is simply an implementation of that policy. The second occurs where no rule has been announced as policy but federal law has been violated by an act of the policymaker itself. Finally, a policy or custom may also exist where the policymaker has failed to act affirmatively at all, though the need to take some action to control the agents of the government is so obvious, and the inadequacy of existing practice so likely to result in the violation of constitutional rights, that the policymaker can reasonably be said to have been deliberately indifferent to the need.

*Id.* at 583-84.

The jury could reasonably have found that customs existed in PHS that were likely to result in the violation of constitutional rights with regard to which the policymaker failed to act. In his closing argument, plaintiff identified a number of customs of PHS that could give rise to liability. Plaintiff asked the jury to find PHS liable because it tolerated that the medical notes of treating doctors at SCI Graterford were incomplete and inaccurate, the treating doctors performed no or incomplete physical examinations, the treating doctors failed to take or review a family history, and the treating doctors failed to create a differential diagnosis or attempt to reach a diagnosis. N.T. 3/14/2011, 13-17.

Baez produced evidence that the three doctors that treated him at SCI Graterford all demonstrated these same failures. *See, e.g.*, N.T. 3/8/2011, 19-20, 25, 30-31. Baez also produced evidence that PHS had a financial incentive to provide perfunctory care because PHS shared the cost (up to a cap) of outside medical services with the Department of Corrections, N.T. 3/7/2011, 19-24, and inmates were charged a fee for sick calls, but not for follow-up visits, treatment in the infirmary, examinations scheduled by healthcare providers, or laboratory and other diagnostic tests ordered by providers, *id.* at 27.

Because Baez showed that the deficiencies were common to PHS's numerous healthcare providers and a motive for PHS not to oppose deficient practices, the jury could reasonably have concluded that: (1) it was a widespread practice for PHS physicians not to take a complete history, not to keep accurate and complete records, and/or not to conduct follow-up or refer patients to specialists; and (2) PHS policymakers had actual or constructive knowledge of that practice, realized that the practice was likely to result in an unconstitutional denial of medical care to inmates, and failed to take action to control its agents. The jury was reasonably able to

find that there was a custom of denying proper care to inmates that rose to a level sufficient to establish PHS liability.

Defendant argues that the failure to keep adequate records or to investigate the history of inmates requesting healthcare fails to rise to the level of deliberate indifference as a matter of law.  Defendant cites *Hemingway v. Falor*, 200 Fed. App'x 86 (3d Cir. 2006), a case that held that a physician's assistant was not deliberately indifferent when he prescribed plaintiff a drug without checking plaintiff's medical records or taking a medical history.  However, the court in *Hemingway* held that the physician's assistant would not have found anything in the medical record or history that would necessarily have stopped him from prescribing the drug, and the plaintiff had been prescribed the drug already for years before the physician's assistant prescribed it.  *Hemingway* did not create a broader rule that the state or its agents never need to take a prisoner's medical history or check his medical records.  Defendant also cites *Rossiter v. Andrews*, No. 96-6257, 1997 WL 137195 (E.D. Pa. Mar. 25, 1997).  The court in *Rossiter* held that an inmate did not have a right to have a prison file free of inaccurate information and write-ups; the court did not address medical records or a prisoner's constitutional right to medical care.  A custom of failing to take a patient's history or keep accurate medical records, when those are needed to provide adequate medical care to an inmate, can give rise to a constitutional violation.

Dr. Kolasinski testified that the treating doctors' failures led to their not developing an accurate diagnosis and treatment plan for plaintiff in a timely manner.  The jury could reasonably have believed Dr. Kolasinski that Baez's treating physicians did not give Baez an adequate level of care and caused Baez some injury, while at the same time finding that Baez did not offer sufficient evidence to establish damages.

## V. Conclusion

The jury acted reasonably in finding that PHS violated Baez's Eighth Amendment rights by denying him adequate medical care. The jury also acted reasonably in finding that Baez had not proven he suffered compensatory damages. The court will not supplant the jury's determination with its own by ordering a new trial or entering judgment as a matter of law. The court will deny plaintiff's motion for a new trial and defendant PHS's motion for judgment as a matter of law. An appropriate order follows.